AUSA: Sara Woodward Telephone: (313) 226-9180
AO 91 (Rev. 11/11) Criminal Complaint Agent: Shanika Sanders Telephone: (313) 226-2573

# UNITED STATES DISTRICT COURT

for the

Eastern District of Michigan

United States of America

v.

## LATASHIA MARIAH MCCANTS

Case No.

Case: 2:21-mj-30540
Judge: Unassigned,
 Filed: 11-12-2021 At 06:41 PM
USA v. SEALED MATTER (CMP)(MLW)

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of  January 27, 2020 - December 31, 2020  in the county of  Wayne  in the
 Eastern  District of  Michigan , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1341 | mail fraud |
| 18 U.S.C. § 1343 | wire fraud |
| 18 U.S.C. § 1028A | aggravated identity theft |

This criminal complaint is based on these facts:

☑ Continued on the attached sheet.

_Shanika R Sanders_
Complainant's signature

Shanika Sanders- Special Agent
Printed name and title

Sworn to before me and signed in my presence
and/or by reliable electronic means.

Date:  November 12, 2021 

Judge's signature

City and state:  Detroit, MI 

Anthony P. Patti - U.S Magistrate Judge
Printed name and title

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| LATASHIA MARIAH MCCANTS<br>Defendant | Case No. |

Case: 2:21-mj-30540
Judge: Unassigned,
Filed: 11-12-2021
USA v. SEALED
MATTER (CMP)(MLW)

**Filed Under Seal**

**AFFIDAVIT IN SUPPORT OF
A CRIMINAL COMPLAINT**

I, Shanika Sanders, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a criminal complaint charging the above individual with mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), and aggravated identity theft (18 U.S.C. § 1028A).

2.      I am a Special Agent (SA) of the U.S. Department of Labor, Office of Inspector General (DOL/OIG), and have been so employed since January 2016. Prior to this assignment, I was employed as an investigator in Industry Operations for the Bureau of Alcohol, Tobacco, Firearms and Explosives for three years. I am currently assigned to the Detroit Field Office of DOL/OIG.

3.      During my years at the Department of Labor, I have conducted numerous investigations into criminal violations of both Title 29 and Title 18 of the United

States Code. During this time, I have been either the lead agent or supporting agent on several investigations involving criminal schemes targeting the State of Michigan's (SOM) Unemployment Insurance Agency (UIA) through the filing of false or fictitious unemployment insurance (UI) claims. Based on my direct personal experience with these cases, I have become familiar with the methods that criminals use to attack and exploit the UI systems, as well as tools and methods criminals often utilize to facilitate that fraud.

4.      This affidavit is being submitted for the limited purpose of showing that there is sufficient probable cause for the requested criminal complaint and arrest warrant and does not set forth all my knowledge about this matter. The information stated below is based upon my personal observations as well as information received from State of Michigan Fraud Investigators, special agents of the United States Secret Service (USSS), and other reliable sources.

5.      This investigation concerns false and fraudulent unemployment insurance (UI) claims filed in relation to the COVID-19 pandemic. As described below, LATASHIA MARIAH MCCANTS has conspired to obtain money or property by means of false and fraudulent pretenses and representations, facilitated using interstate wire communications.

**BACKGROUND ON PANDEMIC UNEMPLOYMENT ASSISTANCE**

6.     State unemployment systems and benefits are joint state and federal

enterprises largely financed by taxes on private employers located in that state.

When state unemployment benefits are exhausted, they may be supplemented by

federal funds appropriated by the U.S. DOL.

7.     On March 18, 2020, the Families First Coronavirus Response Act

("FFCRA") was signed into law. The FFCRA provides additional flexibility for

state UI agencies and additional administrative funding to respond to the COVID-

19 pandemic. Then, the Coronavirus Aid, Relief, and Economic Security

("CARES") Act was signed into law on March 27, 2020. It expands states' ability

to provide assistance to many workers impacted by COVID-19, including for

workers who are not ordinarily eligible for UI benefits. The CARES Act provided

for three new temporary UI programs: Pandemic Unemployment Assistance

("PUA"); Pandemic Emergency Unemployment Compensation ("PEUC"); and

Federal Pandemic Unemployment Compensation ("FPUC").

8.     The first program, PUA, initially provided for up to 39 weeks of benefits to

individuals who are: (1) self-employed, seeking part-time employment, or

otherwise would not qualify for regular UI or extended benefits under state or

federal law or PEUC under section 2107 of the CARES Act; and (2) unemployed,

partially unemployed, unable to work, or unavailable to work due to specific

COVID-19 related reason(s). Coverage includes individuals who have exhausted

3

all rights to regular UC or extended benefits under state or federal law or PEUC.

Under the PUA provisions of the CARES Act, business owners, self-employed

workers, independent contractors, or gig workers can qualify for PUA benefits

administered by the State of Michigan Unemployment Insurance Agency (SOM-

UIA) if they previously performed such work in Michigan and are unemployed,

partially unemployed, unable to work, or unavailable to work due to a COVID-19

related reason. PUA claimants must answer specific questions to establish their

eligibility for PUA benefits. Claimants must provide their name, Social Security

Number, and mailing address and self-certify that they meet one of the COVID-19

related reasons for being unemployed, partially unemployed, or unable or

unavailable to work. Initially, the eligible timeframe to receive PUA was from

weeks of unemployment beginning on or after January 27, 2020 through December

31, 2020.

9.      The second program, PEUC, initially provided for up to 13 times the

individual's average weekly benefit amount to individuals who have exhausted

regular UI under state or federal law, have no rights to regular UI under any other

state or federal law, are not receiving UI under the UI laws of Canada, and are able

to work, available for work, and actively seeking work. However, states must offer

flexibility in meeting the "actively seeking work" requirement if individuals are

unable to search for work because of COVID-19, including because of illness,

quarantine, or movement restriction. The eligible timeframe to receive PEUC was from weeks of unemployment beginning after the respective state has an established agreement with the federal government through December 31, 2020. The earliest being April 5, 2020.

10.     The third program, FPUC, provides individuals who are collecting regular UI, PEUC, PUA, and several other forms of UC with an additional $600 per week. The eligible timeframe to receive FPUC was from weeks of unemployment beginning after the respective state had an established agreement with the federal government through July 31, 2020. The earliest being April 5, 2020.

11.     On August 8, 2020, after FPUC expired, a Presidential Memorandum authorized the Federal Emergency Management Agency ("FEMA") to use disaster relief funds pursuant to Section 408, Other Needs Assistance, of the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. §§ 5121-5207, to provide supplemental payments for lost wages to help ease the financial burden on individuals who were unemployed as a result of COVID-19. The Lost Wages Assistance Program ("LWA") served as a temporary measure, if SWAs chose to administer it, to provide an additional $300 per week via a total of approximately $42.5 billion in FEMA funds. The period of assistance for LWA was August 1, 2020 to December 27, 2020, or termination of the program, whichever was sooner.

12.     Then, on December 27, 2020, the Consolidated Appropriations Act, 2021—an omnibus spending bill that included an estimated additional $200 billion in funding for pandemic related UI programs — was signed into law. Through a section titled the Continued Assistance for Unemployed Workers Act of 2020 ("Continued Assistance Act"), Congress extended and modified the three temporary UI programs created by the CARES Act and created a new benefit program.

13.     First, it increased the duration and availability of both PEUC, which provides benefits to individuals who have exhausted their state unemployment benefits, and PUA, which provides unemployment compensation to independent contractors and others unable to access traditional UI benefits. Specifically, the Continued Assistance Act extended PEUC and PUA through March 14, 2021. Additionally, the duration of PUA benefits for eligible individuals was effectively extended from 39 weeks under the CARES Act to a total of 50 weeks; the amount of PEUC benefits for eligible individuals was extended from 13 to 24 times the individual's average weekly benefit amount. FPUC was reauthorized at a lesser amount of $300 per week for weeks of unemployment beginning after December 26, 2020 through March 14, 2021. FPUC benefits remain unavailable for the gap between its expiration in the CARES Act (July 31, 2020) and its reauthorization in the Continued Assistance Act (December 26, 2020).

6

14.     Second, the Continued Assistance Act created a new optional program,
Mixed Earner Unemployment Compensation ("MEUC"), which SOM-UIA opted
to not administer. The MEUC program provides eligible individuals with an
additional $100 payment each week, in addition to the FPUC payment. To be
eligible, an individual must: (1) have received at least $5,000 of self-employment
income in the most recent taxable year prior to the application for regular UC; (2)
be receiving a UI benefit other than PUA for which FPUC is payable; and (3)
submit documentation substantiating their self-employment income. Individuals
receiving PUA are not eligible. MEUC is payable beginning with weeks of
unemployment no earlier than the week ending January 2, 2021 through the week
of unemployment ending on or before March 14, 2021.

15.     On March 11, 2021, as the relief benefits authorized by the Continued
Assistance Act were about to expire, the President signed the American Rescue
Plan Act of 2021, which included an estimated $203 billion in additional relief,
including reauthorization of PUA, FPUC, PEUC, and MEUC. Under the American
Rescue Plan Act, PUA and PEUC were extended, without interruption, to weeks of
unemployment ending on or before September 6, 2021, thereby allowing eligible
individuals to collect PUA and PEUC benefits for an additional 29 weeks (79
weeks total for PUA and 53 times the individual's average weekly benefit amount
for PEUC). However, there are 25 weeks between the week ending March 13,

7

2021 and the last payable week of September 4, 2021, making it unlikely that individuals would exhaust their full entitlement before the two programs expire. Additionally, the $300 FPUC benefit was extended through September 6, 2021. The MEUC program was also extended through September 6, 2021 for SWAs choosing to administer it.

16.     Regardless of which of the three programs described above was involved (that is, whether PUA, PEUC, or FPUC), funds were distributed to program participants by SOM-UIA. These funds were received by the SOM-UIA from the United States Department of the Treasury (Treasury) through Treasury's program entitled Automated Standard Application for Payments, commonly referred to as "ASAP."  ASAP is an electronic system that federal agencies use to securely transfer money to recipient organizations. Federal agencies enroll recipient organizations, authorize their payments, and manage their accounts. Recipient organizations then request payments from these pre-authorized accounts. Recipient organizations may include state and local governments, educational and financial institutions, vendors and contractors, profit and non-profit entities, and Indian tribal organizations. ASAP is free for both federal agencies and recipient organizations.

17.     When the SWA for which the account was funded was ready to receive the funds, the SWA would make a payment request using the ASAP web interface, and

Treasury would then disburse the funds to the SWA's bank account for the SWA's use. The flow of funds from the ASAP account to the SWA's bank account always occurs in one of two electronic payment methods: an Automated Clearinghouse payment, commonly referred to as an "ACH," or by another electronic service operated by the Federal Reserve Bank (FRB) system called Fedwire. Whether the flow of funds from the ASAP account to the SWA's bank account was done by ACH or by Fedwire, there are certain steps along the way that need to occur.

18.     The origin of the payment to the SOM-UIA's bank account from the SOM-UIA's ASAP account originates from wherever the SOM-UIA made the request for payments, which generally occurs where SOM-UIA is located. Once the SPM-UIA makes this request, the Treasury Web Applications Infrastructure (commonly referred to as the TWAI) routes the funds through one of two Operations Centers, either the Dallas Operations Center (DOC) located in Dallas, Texas, or the East Rutherford Operations Center (EROC) located in East Rutherford, New Jersey. The payment path always includes routing through one of these two centers for processing. If it is an ACH payment, the payment generally passes through the ACH Clearinghouse, also known as The Clearing House, in Atlanta, Georgia. Alternatively, if the ASAP payment is being made as a Fedwire payment, the payment path typically passes through the FRB New York's Clearinghouse, located at the EROC in New Jersey. Whether the SOM-UIA's bank account is

9

located in the same state, or elsewhere, the funds would have necessarily flowed through the facilities described above prior to arriving in the SOM-UIA's bank account.

19.     According to data maintained by the U.S. Department of Labor—Employment and Training Administration, State Workforce Agencies (SWA), like the SOM-UIA, requested and received approximately $427 billion in CARES Act funding related to PUA, FPUC, and PEUC benefit payments. In total, it is estimated that as of September 2021, the federal government's response to the COVID-19 pandemic will have included approximately $872.5 billion in pandemic related UI funding for SWAs to administer for individuals who have been impacted by COVID-19.

## **SUMMARY**

20.     There is probable cause to believe that LATASHIA MARIAH MCCANTS willfully committed both mail and wire fraud; that is, obtained money or property through the submission of false and fraudulent UI claims, the processing and payment of which involved both the use of the mails and interstate wire transmissions. Further, LATASHIA MARIAH MCCANTS made use of the personal identifying information (PII) of multiple individuals during and in relation to the scheme to defraud and obtain money or property.

21.     The investigation has revealed that LATASHIA MARIAH MCCANTS is responsible for the submission of eight (8) fraudulent UI claims, and an Economic Injury Disaster Loan (EIDL) funded by the Small Business Administration (SBA), using stolen PII. As a result of the fraudulent claims, the State of Michigan UIA has paid out approximately $36,040 and the SBA $129,400.

22.     Multiple UI claims have been linked together based upon a PayPal account belonging to LATASHIA MARIAH MCCANTS. Seven (7) of the eight (8) UI claims were deposited onto debit cards, and five (5) of those were linked to MCCANTS PayPal account and used to make multiple purchases. One fraudulent UI claim was denied, and no funds were released. The fraudulent UI claims were also linked based upon other claim attributes such as the bank accounts' mailing addresses and phone numbers.

23.     In order to be eligible for UI benefits, the worker must have demonstrated a certain level of earnings in several quarters immediately preceding the filing of the PUA UI application. PII used by MCCANTS, for five (5) of the fraudulent UI claims, belonged to people over the age of 70, who had not recently earned income in the State of Michigan. Also, two of those claimants passed away earlier this year.

## PROBABLE CAUSE FOR UI FRAUD

24.     In May 2020, a postal inspector at the United States Postal Inspection

Service (USPIS) in Detroit picked up approximately 100 SOM-UIA mailings

addressed to a variety of names at 20175 Santa Barbara in Detroit. Your affiant

checked the Santa Barbara address with the SOM-UIA and learned that 350 UI

claims were filed using that address for a total of up to $250,000 in claims.

During the course of this investigation, it was determined that MCCANTS was one

of many subjects submitting UI claims and using the Santa Barbara address.

25.     On May 14, 2020, a fraudulent UI benefit claim was filed in the State of

Michigan in the name of "M.A." for $4,560.00.[1] On May 15, 2020, the State of

Michigan approved this claim and subsequently deposited the funds into a Choice

Financial Group account ending -3440. The Choice account ending in -3440 had a

Current Mobile Banking Visa debit card in the name of "M.A." The Choice

account listed a mailing address of 15389 Ardmore St., Detroit, MI 48227. Your

affiant has determined that MCCANTS has accounts with PayPal and Huntington

bank in her name, and during 2020, she listed the Ardmore address as her mailing

address for her PayPal and Huntington accounts. In addition, the -3440 Choice

_____

[1] The full names for the claims referenced in this paragraph and throughout the
complaint are known to your affiant but not included in this publicly filed
complaint to protect potential victims of identity theft.

bank account listed a phone number ending in -2091. Subscriber information for this number shows that it is assigned to Nicholas Williams. Williams and MCCANTS have a child in common. The Choice debit card in the name of "M.A." was sent through the U.S. Mail to the Ardmore address in May 2020.

26.     Your affiant has reviewed expenditures from the Current Mobile Banking Visa debit card in the name of "M.A." The Current Mobile Banking records contained multiple PayPal transactions. Your affiant then obtained PayPal records for the account associated with the debit card in the name of "M.A.", and determined that this PayPal account was in MCCANTS's name with an account number ending in -2161. The records for MCCANTS's PayPal account show that she made purchases through PayPal using the fraudulent UI funds deposited into the "M.A." Current account.

27.     On May 16, 2020, a fraudulent UI benefit claim was filed in the State of Michigan in the name of "C.B." for $4,560.00. On May 19, 2020, the State of Michigan approved this claim and subsequently deposited the funds into a Choice Financial Group account ending -3218. The Choice account ending in -3218 had a Current Mobile Banking Visa debit card in the name of "C.B." The Choice debit card in the name of "C.B." was sent through the U.S. Mail.

28.     The PayPal records for MCCANTS's account ending in -2161 showed that the "C.B." Current Visa debit card was added to the account on May 24, 2020. On

13

May 24, May 26, and May 27, 2020, the Current bank statement and transaction

records provided by PayPal show MCCANTS made multiple purchases through

PayPal using the fraudulent UI funds deposited into the "C.B." Current account.

29.     On October 12, 2021, investigators contacted "C.B." who stated that he did

not make a UI claim in Michigan. "C.B" has been retired for many years. "C.B."

confirmed the SSN and DOB used to file the fraudulent UI claim belonged to him,

but he was unfamiliar with the physical address or email address used in the filing

of the claim and further stated has never lived or worked in the city of Detroit.

"C.B." also stated that he was unaware that a UI claim had been filed in his name

and said he did not provide his information to anyone for the purpose of filing a UI

claim.

30.     On May 20, 2020, a fraudulent UI benefit claim was filed in the State of

Michigan in the name of "J.J." for $5,480.00. On June 22, 2020, the State of

Michigan approved this claim and subsequently deposited the funds into a Choice

Financial Group account ending -1276. The Choice account ending in -1276 had a

Current Mobile Banking Visa debit card in the name of "J.J."  The Choice debit

card in the name of "J.J." was sent through the U.S. Mail.

31.     The PayPal records for MCCANTS's account ending in -2161 showed that

the "J.J." Current Visa debit card was added to the account in June 2020. From

June 24th through July 13, 2020, the Current bank statement and transaction

14

records provided by PayPal show that MCCANTS made multiple purchases through PayPal using the fraudulent UI funds deposited into the Current account.

32.     On May 20, 2020, a fraudulent UI benefit claim was filed in the State of Michigan in the name of "N.S." for $6,240.00. On June 22, 2020, the State of Michigan approved this claim and subsequently deposited the funds into a Choice Financial Group account ending -1264. The Choice account ending in -1264 had a Current Mobile Banking Visa debit card in the name of "N.S."  The Choice account ending in -1264 listed 15389 Ardmore St., Detroit, MI 48227 as the mailing address. As explained above, this address was used by MCCANTS in 2020.

33.     The PayPal records for MCCANTS's account ending in -2161 showed that the "N.S." Current Visa debit card was added to the account on July 15, 2020. On July 15 and July 19, 2020, the Current bank statement and transaction records provided by PayPal show that MCCANTS made multiple purchases through PayPal using the fraudulent UI funds deposited into the "N.S." Current account.

## BACKGROUND ON ECONOMIC INJURY DISASTER LOAN

34.     Under the provisions of The CARES Act, $2.2 trillion dollars in economic stimulus was passed by the 116th U.S. Congress and signed into law by President Donald Trump in March 2020 in response to the economic decline caused by the COVID-19 pandemic in the United States.

15

35.     The provisions of The CARES Act, in conjunction with an officially

declared disaster by the United States Government, allowed for the SBA to offer

Economic Injury Disaster Loan (EIDL) funding to business owners negatively

affected by the COVID-19 pandemic. Using the SBA online portal, EIDL

applicants submit personal and business information in support of each EIDL

application, and they do not have to submit supporting documentation of any sort.

36.     The application includes a jurat-like paragraph where the applicant affirms

that the information submitted is true and correct under the penalty of perjury and

applicable criminal statutes. The application process involves filling out assorted

data fields relating to the size of the affected business entity, the ownership of said

business, and other information such as the number of employees and gross

business revenues realized in the 12 months prior to COVID-19 impact on the

national economy. This information, submitted by the applicant, is then used by

SBA systems to calculate the principle amount of money the small business is

eligible to receive in the form of an EIDL.

37.     However, in conjunction with the submission of an EIDL application, by

simply clicking on, and checking a box within the on-line application, an applicant

may request and then receive up to $10,000.00 in an EIDL Cash Advance Grant

based on the number of employees claimed ($1,000 per employee claimed up to 10

employees). The EIDL Cash Advance Grant need not be repaid to the SBA if the

loan application is ultimately denied by the SBA, or if the applicant declines the EIDL that may be offered by the SBA at a later date.

38.     Pursuant to the provisions governing the EIDL program, loan proceeds must be used by that business on certain permissible expenses. The EIDL (working capital) loans may be used by the afflicted business, which must have existed in an operational condition on February 1, 2020, to pay fixed debts, payroll, accounts payable, and other bills that could have been paid had the COVID-19 disaster not occurred.

### PROBABLE CAUSE FOR EIDL FRAUD

39.     On August 2, 2020, a false SBA Loan Intake application was submitted in the name of "P.R." for a COVID-19 Economic Injury Disaster Loan. SBA Loan ending in 8209 was created using "P.R.s" SSN as an EIN for a sole proprietorship. The application stated "P.R." was an owner of a spa that grossed $286,765.00, located in the State of Michigan, prior to COVID-19. The false application also stated the company had six employees. The signature for the loan application was completed electronically.

40.     On May 18, 2020, a fraudulent Michigan UI claim made in the name of "P.R." totaling $4,560.00 was approved and subsequently deposited into a Chime Financial Spending/Savings account ending -8461. Per Stride Bank (who services Chime accounts), the account ending -8461 was created using the name "P.R." on

May 14, 2020. 15389 Ardmore St., Detroit, MI 48227 was identified as the mailing address associated with the account. Law Enforcement database searches by the affiant, and bank records for MCCANTS show that during 2020, this was MCCANTS's mailing address.

41.     On August 3, 2020, the same Chime account received a payment from SBA for $129,400. During the first month after the deposit was made, 29 ATM withdrawals were made in the Eastern District of Michigan, for a total of $14,500. In September, another $4,000 was withdrawn via ATMs.

42.     PayPal records reviewed by the affiant shows the "P.R." Chime Visa debit card was added to MCCANTS's -2161 PayPal account on May 26, 2020. From September 7, 2020 through September 17, 2020, the Chime bank statement and transaction records provided by PayPal show MCCANTS made 19 purchases through PayPal using the fraudulent SBA funds deposited into the Chime account.

43.     During the month of October 2020, $26,000 was withdrawn at Wal-Mart. The Chime records reviewed showed the SBA Loan was not used as intended by the SBA, in order to pay fixed debts, payroll, accounts payable, and other bills that could have been paid had the COVID-19 disaster not occurred.

44.     On Feb 24, 2021, a Special Agent of the United States Secret Service (USSS) conducted a telephonic interview with "P.K", at her mobile number ending in 3509.  "P.K." stated her name had not been "P.R." since 1996 and that she now

18

goes by "P.K.". "P.K." immediately denied any knowledge of the loan. "P.K."

confirmed her name, date of birth, and last four of her social security number.

"P.K." stated she had not received any notifications of the loan. "P.K." also stated

she does not have accounts at Chime Bank, where the SBA loan funds were

deposited. The interviewer inquired about the address on the loan, 908 Maxwell

SE, Grand Rapids, MI. "P.K." stated that was her old address, prior to moving to

Portland, OR in 2017.

## **CONCLUSION**

45.     Based on the forgoing, there is probable cause to believe that LATASHIA

MARIAH MCCANTS has committed multiple federal crimes, to include mail

fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), and aggravated identity

theft (18 U.S.C. § 1028A). These violations stem from an ongoing scheme to

defraud federal and state unemployment insurance programs to obtain

unemployment benefits, and an SBA loan, by means of false and fraudulent

pretenses and representations. This scheme involved both the wire transmission of

signs and signals in interstate commerce and the use of the mails, and the PII of

multiple individuals was used during and in relation to the scheme.

Respectfully submitted,

Special Agent Shanika Sanders
Department of Labor-
Office of Inspector General

Sworn to before me and signed in my
presence and/or by reliable electronic means.

HON. ANTHONY P. PATTI      November 12, 2021
United States Magistrate Judge

20